UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JIMICO ENTERPRISES, INC.; and
BROWNSON ENTERPRISES, INC.,
               Plaintiffs,              1:07-CV-0578
                                                                  (GTS/DRH)
v.

LEHIGH GAS CORPORATION,
               Defendant.
_____

LEHIGH GAS CORPORATION,
               Counter-Claimant,

v.

BROWNSON ENTERPRISES, INC.; and
PETER BROWNSON,
               Counter-Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

FARUQI, FARUQI, LLP                      RICHARD D. SCHWARTZ, ESQ.
  Counsel for Plaintiffs Jimico and Brownson Enter.    KENDALL S. ZYLSTRA, ESQ.
  and Counter-Defendant Brownson Enter.
369 Lexington Avenue, 10th Floor
New York, NY 10017

McNAMEE, LOCHNER TITUS & WILLIAMS, P.C.    CHRISTOPHER MASSARONI, ESQ.
  Counsel for Plaintiffs Jimico and Brownson Enter.
  and Counter-Defendant Peter Brownson
677 Broadway
Albany, NY 12207-2503

HARRITON & FURRER, LLP                URS BRODERICK FURRER, ESQ.
  Counsel for Defendant / Counter-Claimant
84 Business Park Drive, Suite 302
Armonk, NY 10504

HON. GLENN T. SUDDABY, United States District Judge

**MEMORANDUM-DECISION and ORDER**

On September 14, 2010, the Court held an evidentiary hearing on damages in this action, filed by Jimico Enterprises, Inc. and Brownson Enterprises, Inc. ("Plaintiffs") against Lehigh Gas Corporation ("Defendant") pursuant to, *inter alia*, The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2805. At the hearing, documentary evidence was admitted,[1] and testimony was taken of Plaintiffs' five witnesses,[2] as well as Defendant's witness.[3] At the conclusion of the hearing, the Court indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiffs are awarded a total of $141,892.79 in compensatory damages, and a total of $30,000.00 in punitive damages, in this action.[4]

---

[1] The documentary evidence consisted of the following: Hrg. Ex. PJ-1 (Operations Analysis of Angola Station for 2004); Hrg. Ex. PJ-2 (Operations Analysis of Angola Station for 2005); Hrg. Ex. PJ-3 (Operations Analysis of Seneca Station for 2004); Hrg. Ex. PJ-4 (2005 Operations Analysis of Seneca Station for 2005); Hrg. Ex. PJ-5 (Supplemental Expert Witness Report of Jeffrey Bernard, dated Sept. 9, 2010); Hrg. Ex. PJ-7 (Plfs.' Compl.); Hrg. Ex. PJ-8 (Notice of Termination to Brownson Enter. dated Jan. 22, 2007); Hrg. Ex. PJ-9 (Email Message from Ed Miller to Linford Bauder dated July 27, 2006); Hrg. Ex. PJ-10 (Email Message from Tom Caverly to Linford Bauder dated Nov. 17, 2006); Hrg. Ex. PJ-11 (Email Message from Tom Caverly to Linford Bauder *et al.* dated Nov. 21, 2006); Hrg. Ex. PJ-12 (Email Message from Linford Bauder to Ed Miller dated Feb. 2, 2007); Hrg. Ex. PJ-13 (Expert Witness Report of Jeffrey Bernard dated Aug. 15, 2008); Hrg. Ex. PJ-14 (Addendum to Expert Witness report of Jeffrey Bernard dated Oct. 30, 2008); Hrg. Ex. PB-1 (Brownson Enter. Fin. Statements ending Dec. 31, 2005); and Hrg. Ex. PB-2 (Brownson Enter. Fin. Statements ending Dec. 31, 2006).

[2] Plaintiffs' five witnesses consisted of the following: (1) James Dammen, President of Jimico Enterprises; (2) Karl Herba, an accountant for Jimico Enterprises; (3) Peter Brownson, President of Brownson Enterprises; (4) Joseph Bradley, an accountant for Brownson Enterprises; (5) and Jeffrey Bernard, Plaintiffs' expert witness.

[3] Defendant's witness was David Hrinak, President of Lehigh Gas.

[4] Specifically, Plaintiff Jimico Enterprises, Inc. is awarded a total of $120,461.38, and Plaintiff Brownson Enterprises, Inc. is awarded a total of $51,431.38.

I.  **RELEVANT BACKGROUND**

Because this Decision and Order is intended primarily for the review of the parties, and because the parties have demonstrated an accurate understanding of the claims, facts and issues presented in this action, the Court will not, in this Decision and Order, describe in detail those claims, facts and issues.  Rather, the Court will simply refer the parties to the relevant portions of that Decision and Order of July 27, 2010, which generally describes the claims, facts and issues remaining in this action, following the Court's decision on the parties' cross-motions for summary judgment.  *See generally Jimico Enter., Inc. v. Lehigh Gas Corp.*, 07-CV-0578, 2010 WL 2985962 (N.D.N.Y. July 27, 2010) (Suddaby, J.).

II. **GOVERNING LAW**

Again, because this Decision and Order is intended primarily for the review of the parties, and because the parties to this action have demonstrated (particularly, in their pre-hearing written submissions of September 13, 2010, and their oral arguments to the Court on September 14, 2010) a general understanding of the legal standards governing the damages hearing in this action, the Court will not, in this Decision and Order, describe in detail those legal standards.  Rather, the Court will simply refer the parties to the relevant portions of their pre-hearing briefs.  (*See generally* Dkt. Nos. 77, 78.)

The Court would add only two points.  First, "the plaintiff[ has the] burden to put on proof from which the [factfinder] c[an] ascertain damages with reasonable certainty[.]" *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California*, 153 F.3d 938, 947 (9th Cir. 1998).  Second, Defendant has argued that Plaintiffs are not entitled to any damages because (1) Section 2805 allows for the recovery of damages only based on a violation of Section 2802, 2803, or

3

2807, and (2) in the Court's Decision and Order of July 27, 2010, the Court determined that Defendant violated Section *2804* of the PMPA. As stated during the evidentiary hearing, the Court rejects this argument, given that the relevant portion of the PMPA–i.e., Section 2803, which governs trial franchise relationships–provides that a franchisor must comply with the notice requirements of Section 2804, prior to non-renewal of the trial franchise relationship.[5]

## III. ANALYSIS

### A. Compensatory Damages

#### 1. Lost Income from Relevant 90-Day Periods

With regard to Plaintiffs' request for damages compensating them for their lost income, the Court finds that Plaintiffs are entitled to lost income of a total of $81,683: $62,560 in income that would have been earned by Plaintiff Jimico during the relevant 90-day periods at the Angola and Seneca Stations ($41,977 in income at the Angola Station, and $20,583 in income at the Seneca Station); and $19,123 in income that would have been earned by Plaintiff Brownson

---

[5] *See* 15 U.S.C. § 2803(c)(1) (noting that, "[i]f the notification requirements of section 2804 . . . are met, any franchisor may fail to renew any franchise relationship . . . under any trial franchise, at the conclusion of the initial term of such trial franchise"); *see also Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1382, 1389-91 (10th Cir. 1981) (affirming district court's decision denying defendant's motions for directed verdict and for judgment notwithstanding the verdict, where jury awarded plaintiff monetary damages based, in part, on defendant's failure to furnish statutorily required notice of non-renewal of franchise relationship); *Oparaocha v. Sun Co., Inc.*, 3 F. Supp.2d 4, 6-7 (D. D.C. 1998) (finding that, where jury awarded franchisee money damages based, in part, on defendant's violation of the notice requirements of the PMPA, franchisee was also entitled to exemplary damages for franchisor's willful violation of 90-day notice requirement of PMPA); *Martin v. Texaco, Inc.*, 602 F.S upp. 60, 61 (N.D. Fla. 1985) ("Whether plaintiff received the [summary] statement [required by notice provisions of the PMPA] is purely an issue of credibility and must be submitted to the jury. If the jury finds that plaintiff did not receive the statement, the question arises as to whether plaintiff suffered any harm or injury. . . . [W]hether plaintiff was harmed is purely an issue of damages and must . . . be submitted to the jury.").

during the relevant 90-day period at the New Baltimore Station.

Generally, the Court bases this finding on the following, in part: (1) Hrg. Ex. PJ-1 (Operations Analysis of Angola Station for 2004); (2) Hrg. Ex. PJ-2 (Operations Analysis of Angola Station for 2005); (3) Hrg. Ex. PJ-5 (Supplemental Expert Witness Report of Jeffrey Bernard, dated Sept. 9, 2010); (4) the hearing testimony of Karl Herba, an accountant for Plaintiff Jimico; (5) the hearing testimony of Jeffrey Bernard, Plaintiff's expert witness; (6) the fact that Plaintiffs requested these precise amounts of lost income for the relevant 90-day periods, and the fact that defense counsel conceded, during the hearing, that Defendant did not have any objection to the calculations performed by Plaintiffs regarding that lost income.

The Court notes that Plaintiffs' calculations appear afflicted by a number of flaws, including the following: (1) the fact that, although the 90-day period regarding the Angola Station included four days from July 2006 and twenty-five days from October 2006, Plaintiffs' calculations regarded no days from July 2006, and all thirty-one days in October 2006; (2) the fact that, although the 90-day period regarding the Seneca Station consisted of April through June of 2007, Plaintiffs' calculations regarded no days from April 2007, and all thirty-one days in July; (3) the fact that, although Plaintiffs' expert relies on monthly financial data regarding the Seneca Station from 2006, Plaintiffs did not admit such data into evidence at the hearing; and (4) the fact that, although the 90-day period regarding the New Baltimore station regarded the months of February, March, April and May of 2007, Plaintiffs' calculations regarded the entirety of years of 2004, 2005 and 2006. However, the Court has carefully analyzed the underlying financial data that was made available to it, and has concluded that the financial data supports an award of lost income substantially the same as that requested by Plaintiffs and unopposed by

Defendant.

Finally, the Court notes that Plaintiff appears to argue that a third-party franchisee may have earned higher profits on the New Baltimore Station than Plaintiff Brownson would have earned during the relevant 90-day period, because Defendant would have sold gas at a lower rate to a third-party franchisee who owned other gas station franchises with Defendant on the Thruway. However, the Court finds such a fact, even if presumed to be true, to be immaterial to the lost profits that *Plaintiff Brownson* would have earned at the New Baltimore Station during the relevant 90-day period.

### 2. Lost Profits from Sales of Trial Franchises

With regard to Plaintiffs' request for damages compensating them for their lost profits from the sales of their trial franchises, the Court finds that Plaintiffs are entitled to such lost profits in the total sum of $60,209.76: Plaintiff Jimico's lost profits for the Angola and Seneca Stations are $37,901.38 ($16,632.50 regarding the Angola Station after the imposition of Defendant's transfer fee of $10,000, and $21,268.88 regarding the Seneca Station after the imposition of Defendant's transfer fee of $10,000); and Plaintiff Brownson's lost profits for the New Baltimore Station after the imposition of Defendant's transfer fee of $10,000 is $22,308.38. The Court notes that the parties' Trial Franchise Agreements provide that, as a condition to any sale of the trial franchises in question, Plaintiff would have had to pay Defendant a non-refundable administrative fee (which was generally $10,000 per transfer) in connection with each transfer to compensate Defendant for costs and expenses that would have been incurred

with regard to the transfers (Hrg. Ex. PJ-7 [Plfs.' Compl., attaching Section 12.1).[6]

The Court reaches this conclusion (regarding Plaintiff's lost profits from the sales of their trial franchises) after carefully considering, and partially rejecting, both parties' arguments. The parties vigorously dispute the value of Plaintiffs' trial franchises. Plaintiffs argue that, based on a standard three-fold calculation of the franchises' yearly EBITA (i.e., their earnings before interest, taxes, depreciation and amortization), the trial franchises were worth a total of $721,678 (specifically, $213,060 for the Angola Station, $250,151 for the Seneca Station, and $258,467 for the New Baltimore Station). On the other hand, Defendant argues that, during the relevant periods in question, the trial franchises had no value whatsoever due to, *inter alia*, the terminated nature of the trial franchises, and the brevity of the terms left on Plaintiffs' leases with Defendant.

Despite Plaintiffs' zealous and persistent efforts in the hearing, they were unable to adduce any evidence of there ever having occurred, in the gas station market, a sale of a terminated trial franchise with 90 days or less remaining on the term of its lease.[7] On the other

---

[6] The Court also notes that, during the hearing, the Court advised the parties in writing of the eleven conditions that appear to be imposed by the parties' Trial Franchise Agreements. (Dkt. No. 81 [Court Exhibit 1].) However, rather than arguing that the Trial Franchise Agreements ("TFAs") do not in fact impose these eleven conditions, Plaintiffs merely tried to show that *some* of the conditions would have been overcome with relative ease, especially if there existed a willing purchaser, a willing seller, and a willing franchisor.

[7] The Court notes that, at the hearing, Plaintiffs attempted to argue that, because Lehigh Gas Corporation reached a settlement with Sunoco and the Thruway sometime after September 25, 2006 (pursuant to which Lehigh became the long-term franchisor of the Mobile-branded stations), Plaintiffs would have been able to effectively sell to a third-party franchisee a long-term franchise with regard to the Seneca and New Baltimore Stations. The Court is unpersuaded by this argument for two reasons. First, the PMPA makes clear that a trial franchise that is transferred or assigned by a franchisee remains a trial franchise. 15 U.S.C. § 2803 ("The term 'trial franchise' does not include any unexpired period of any term of any franchise (other

hand, Defendant adduced no evidence that such trial franchises possess no value whatsoever to a gas station owner interested in purchasing an *opportunity* to obtain, at some point after the expiration of the short-term lease, a permanent franchise on the New York State Thruway, upon satisfying the requirements of the franchisor.

Based on the record evidence, the Court finds that three significant obstacles inhibited Plaintiffs' sale of their trial franchises for a total of $721,678 within the 90-day time periods in question–each of which reduced the chances of such a sale by fifty percent. Specifically, these obstacles were as follows: (1) Plaintiffs had to find one or more willing purchasers of the three stations; (2) Plaintiffs had to persuade the purchaser(s) to accept Plaintiffs' demand of full value for the stations; and (3) Plaintiffs had to complete, and obtain Defendants' approval of, the sales. As a result, the Court finds that Plaintiffs' enjoyed only a twelve-and-a-half-percent chance of selling their trial franchises for a total of $721,678.

The Court bases its finding regarding the first obstacle (i.e., the need to find one or more willing purchasers of the three stations) on the following pieces of record evidence, among others: (1) the condition, in the parties' Trial Franchise Agreements, that Plaintiffs' proposed third-party transferee would have had to, to Defendant's satisfaction, meet Defendant's then-current requirements for new franchise dealers, including its requirements relating to credit, financial capability, business and personal qualifications, and business experience and training

---

than a trial franchise, as defined by paragraph [1]) which was transferred or assigned by a franchisee to the extent authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to any provision of the franchise."). Second, Plaintiffs failed to adduce record evidence (e.g., testimony of Defendant's employees) establishing that Defendant would have signed a long-term franchise agreement with whatever third-party franchisee to which Plaintiffs transferred their trial franchise rights.

(Hrg. Ex. PJ-7 [Plfs.' Compl., attaching Sections 12.2, 12.3, 4.3, 4.4); (2) the condition, in the parties' Trial Franchise Agreements, that Plaintiffs' proposed third-party transferee would have had to complete, and cause its Managers and management and non-management employees to complete, to Defendant's satisfaction, such initial and refresher training as Defendant may require (*id*. at Section 12.3); (3) the testimony of Peter Brownson, President of Plaintiff Brownson, that the only potential purchasers who would have been profitable were ones who then owned Lehigh Gas Corporation gas station franchises on the New York State Thruway;[8] (4) the testimony of Karl Herba, an accountant for Plaintiff Jimico, that, "some months" after the termination of the Angola Station, one of his clients (Edward Allen) said he "would have taken a look at [the Angola Station]" had he known of the termination before another franchise replaced Plaintiff Jimico, but that he "never really talked price or anything like that," and he never indicated he would have paid for a terminated trial franchise;[9] (5) the testimony of Joseph Bradley, an accountant for Plaintiff Brownson, that, *after* the termination of the New Baltimore Station, he received a telephone call from a client who was interested in the station, and that, while that client had "disposable money that was readily available" and existing Mobil stations, he had no existing Lehigh Gas Corporation stations;[10] and (6) the admissions of Karl Herba, Peter Brownson, Joseph Bradley, and Jeffrey Bernard, Plaintiffs' expert witness, that they had no

---

[8] More specifically, Peter Brownson testified that, in order to find a willing transferee, that transferee would have had to own other franchises with Defendant on the thruway (so that Defendant would raise the margin at the New Baltimore stations, as indicated by Ed Miller at Lehigh Gas Corporation).

[9] (Hrg. Tr. at 52-53, 71-72.)

[10] (*Id*. at 115-16, 126.) The Court notes that, later in his testimony, Mr. Bradley testified that he received the telephone call from the individual in question *before* the termination of the New Baltimore Station. (*Id*. at 125.)

knowledge of there ever having occurred, in the gas station market, a sale of a terminated trial franchise with 90 days or less remaining on the term of its lease.[11]  Under the circumstances, Plaintiffs have shown only that it was as likely as not that they would have found one or more willing purchasers of the three stations.

The Court bases its finding regarding the second obstacle (i.e., the need to persuade the purchasers to accept Plaintiffs' demand of full value for the stations) on the following pieces of record evidence, among others: (1) the admission of Karl Herba, an accountant for Plaintiff Jimico, that at least "some" prospective purchasers would have been discouraged by the fact that Plaintiff Jimico's franchise at the Angola Station had been terminated (and the fact that, at most, only 90 days remained on the lease);[12] (2) the admission of Mr. Herba that the temporary nature

---

[11]   (*Id*. at 55, 83-84, 95-96, 113-15, 123-26, 128, 157.)  The Court notes that, while Peter Brownson testified that he once made an *offer* to buy a terminated franchise (in Greenbush, New York) from a man named Bill Malone, that transaction was distinguishable from the transaction in question in five respects: (1) that terminated franchise was not a *trial* franchise; (2) the terminated franchise had a balance of *more* than 90 days on it; (3) the offer was made based on Mr. Brownson's understanding that the franchise would be "automatically renewed" unless he violated the terms of the lease; (4) the offer was expressly *conditioned* on a "rebuild" of the station by the franchisor; and (5) in any event, the ultimate sale never occurred.  (*Id*. at 83-84, 95-96.)  Similarly, while Joseph Bradley testified that he once saw a pregnant woman sell a gas station franchise on twenty-four hours notice, that transaction was distinguishable from the transaction in question in three respects: (1) the franchisor, not the franchisee, found the suitable purchaser; (2) the franchise that was sold had at least a year left on the term; and (3) the franchise that was sold was quasi-permanent in that it was understood by the parties to be converted permanent after three months.  (*Id*. at 113-15.)  Moreover, while Joseph Bradley testified that he has had experience with the sales of two trial franchises (one in Saratoga, and one in Voorheesville), both of those trial franchises were not yet terminated and, in any event, at least one of them automatically converted to a permanent franchise after the expiration of the term.  (*Id*. at 123-26.)  Finally, Jeffrey Bernard testified that, while sales of trial franchise agreements sometimes occur, he has never seen any sales of trial franchises that had been terminated.  (*Id*. at 157.)

[12]   (Hrg. Tr. at 52.)

10

of the term left on the terminated trial franchise would have diminished the price paid by a prospective purchaser;[13] (3) the admission of Mr. Herba that, for such a sale to occur, the purchase agreement would have had to contain some sort of "contingency" arrangement, pursuant to which the balance of the full-asking price would not have been due unless and until the purchaser obtained a "regular franchise";[14] (4) the same admission by Jeffrey Bernard, Plaintiffs' expert witness;[15] (5) the admission of Joseph Bradley, an accountant for Plaintiff Brownson, that the referenced contingency contract would also have had to be conditioned on the franchisor's agreement, in advance, that it "was going to allow a permanent franchise";[16] and (6) the testimony of James Dammen, President of Jimico that, in the fall of 1988, the former owner of the Seneca Station franchise (an entity named Sugar Creek) gave up the franchise without even trying to sell it to a third party, and that Mr. Dammen acquired the franchise from

---

[13]   (*Id*. at 56.)

[14]   (*Id*. at 48, 53.)

[15]   (Hrg. Tr. at 139-40.)

[16]   (*Id*. at 116.) With regard to Plaintiffs' argument that they could have sold their franchises to third parties through use of an agreement to which Defendant was also a promising party, the Court notes that a promise by Defendant was not something Plaintiffs could sell, during the time in question. An owner of a property interest cannot transfer more than what he owns. *See Rest. (Second) of Contracts* s 336, Comment b (1981) ("[T]he assignment of a non-negotiable contract right cannot transfer more than what the assignor has . . . ."); *Fine v. Sovereign Bank*, 671 F. Supp.2d 219, 225 (D. Mass. 2009) ("[I]t is a central tenet of contract and property law that an individual who receives an item from another can take no better title to the item than was held by the transferor . . . ."); *see, e.g.*, *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (agreeing that "the owner of a patent cannot transfer an interest greater than that which it possesses"); *Lah v. Rogers*, 125 Ohio App.3d 164, 177-78 (Ohio App., 11th Dist., 1998) ("Obviously, it is a basic principle of property law that an individual cannot sell an estate in land that is greater than the estate actually possessed by that individual.").

Mobil upon paying no money.[17]   Under the circumstances, Plaintiffs have shown only that it was as likely as not that they would have succeeded in persuading the purchaser(s) to accept Plaintiffs' demand of full value for the stations.

The Court bases its finding regarding the third obstacle (i.e., the need to complete, and obtain Defendants' approval of, the sales) on the following pieces of record evidence, among others: (1) the condition, in the parties' Trial Franchise Agreements, that Plaintiffs could not have been in default under the TFAs (*see* Hrg. Ex. PJ-7 [Plfs.' Compl., attaching Section 12.2 of TFAs]); (2) the condition, in the parties' Trial Franchise Agreements, that Plaintiffs may have been be required to pay all outstanding debt to Defendant or third-party contractors/vendors (*id*.); (3) the testimony of Peter Brownson, President of Plaintiff Brownson, that, before the termination in question, $89,000 in drafts to Defendant were returned to Brownson unpaid by it;[18] (4) the testimony of Jeffrey Bernard, Plaintiffs' expert witness, that, for one or more of the eleven obstacles contained in the parties' Trial Franchise Agreements (listed in Court Exhibit 1, contained in Dkt. No. 81) to not be "fatal" to a prospective sale, there must exist a willing purchaser, willing seller *and willing franchisor*;[19] (5) the testimony of Karl Herba, an accountant for Plaintiff Jimico, that the conditions imposed by the parties' Trial Franchise Agreements would "may [have] impact[ed]" the ability of Plaintiff Jimico to get a deal done within 90 days of notice of termination;[20] (6) the testimony of Mr. Herba that, even setting aside the conditions

---

[17]   (Hrg. Tr. at 16, 18-19.)

[18]   (Hrg. Tr. at 92-94.)

[19]   (*Id*. at 146-47, 158-59.)

[20]   (*Id*. at 77.)

imposed by the parties' Trial Franchise Agreements, generally, it would have taken "a couple weeks" for a prospective purchaser to conduct due diligence of Angola or Seneca Stations, "maybe a month" to arrive at agreed-upon sale price, then between "a couple days to a couple months" to "draw up the proper documentation"–assuming "everyone [is] motivated";[21] and (7) the testimony of Joseph Bradley, an accountant for Plaintiff Brownson, that, setting aside the conditions imposed by the parties' Trial Franchise Agreements, generally, before a sale may be completed, a prospective purchaser must be located, the seller and prospective purchaser must trade financial statements, the price must be decided on (which "probably [takes] two days"), and the contract must be prepared and signed (which "maybe takes two weeks").[22] Under the circumstances, Plaintiffs have shown only that it was as likely as not that they would have completed, and obtained Defendant's approval of, the sales during the time periods in question.

      Finally, the Court notes that authority exists for the point of law that, in a PMPA case, the fact-finder may discount the plaintiff's requested damages in the way the Court has done in this action (and still reach an award that is not speculative and uncertain). *See Portland 76 Auto/Truck Plaza, Inc.*, 153 F.3d at 947 (noting that "[t]he jury may . . . use[] a different theory from the one plaintiff's expert witness used to calculate the damages" and still reach an award that "was not excessively speculative"). Furthermore, the Court notes that, even if Plaintiff's had not proven to "a reasonable certainty" the lost profits found by the Court herein in the sum of $60,209.76, the Court would award that sum to Plaintiff as punitive damages, in addition to the punitive damages described below in Part III.B. of this Decision and Order.

---

   [21]    (*Id.* at 69-71, 74.)

   [22]    (*Id.* at 110.)

**B.    Punitive Damages**

In addition, Plaintiffs argue that, under the circumstances, they are entitled to punitive damages given the willful nature of Defendant's conduct in intentionally violating the 90-day notice requirement established by the PMPA. Defendant responds by arguing that (1) the son of James Dammen (owner of Plaintiff Jimico) had stated to a Lehigh representative that Plaintiff Jimico was prepared to leave one of the Stations, suggesting that Plaintiff Jimico had consented to the termination of that particular trial franchise agreement, and (2) in any event, with regard to each of the three terminations in question, Defendant's violation of the 90-day notice requirement was not malicious but caused by the requirements imposed on it by the New York State Thruway Authority, and Defendant's reasonable concern that permitting Plaintiffs (who were in dire financial straights) to operate the trial franchises during the 90-days in question would have caused Defendant to violate those requirements.

After carefully considering the matter, the Court finds that Defendant's purported excuses are insufficient. With regard to each of the three terminations in question, Defendant could have complied with the PMPA's notice requirements while still adequately ensuring its own compliance with the requirements imposed on it by the New York State Thruway Authority. For example, Defendant could have given Plaintiffs less than 90-days notice if (1) circumstances existed in which it would not have been reasonable for the franchisor to furnish 90-days notice and (2) the franchisor furnished notification to the franchisee on the earliest date on which furnishing of such notification would have been reasonably practicable.[23] Moreover, if such

---

[23]    *See* 15 U.S.C. § 2804(b)(1)(A) ("In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, . . . such franchisor shall furnish notification to the

circumstances did not exist at the outset of the 90-day notice period, but arose during that 90-day notice period, Defendant could have repossessed the relevant premises and operated them through employees.[24]

Generally, the Court bases this finding (regarding the insufficiency of Defendant's purported excuses) on the following, in part: (1) the hearing testimony James Dammen, President of Plaintiff Jimico; (2) the hearing testimony of Peter Brownson, President of Plaintiff Brownson; (3) the hearing testimony of David Hrinak, President of Defendant; (4) Hrg. Ex. PJ-7 (Plfs.' Compl., attaching, *inter alia*, the portions of the parties' Trial Franchise Agreements referencing the 90-day notice requirement; (5) Hrg. Ex. PJ-8 (Notice of Termination to Brownson Enter. dated Jan. 22, 2007); (6) Hrg. Ex. PJ-9 (Email Message from Ed Miller to Linford Bauder dated July 27, 2006); (7) Hrg. Ex. PJ-10 (Email Message from Tom Caverly to Linford Bauder dated Nov. 17, 2006); (8) Hrg. Ex. PJ-11 (Email Message from Tom Caverly to Linford Bauder *et al.* dated Nov. 21, 2006); and (9) Hrg. Ex. PJ-12 (Email Message from Linford Bauder to Ed Miller dated Feb. 2, 2007).

As for the appropriate amount of punitive damages to be awarded, the Court finds that a total of $30,000, or $10,000 for each untimely termination, is appropriate. The Court finds that this amount is appropriate for two reasons. First, $10,000 is the amount specified in the parties' Trial Franchise Agreements as representing the usual costs and expenses that Defendant would

---

franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable.").

[24] *See* 15 U.S.C. § 2804(b)(1)(B)(ii) (permitting a franchisor, "if permitted . . . by the franchise agreement, [to] repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents").

have had to incur in order to transfer a trial franchise to a third party during a 90-day period. (Hrg. Ex. PJ-7 [Plfs.' Compl., attaching Section 12.1.)  Second, the Court finds that this amount would constitute a fair and reasonable deterrent to Defendant and others in future circumstances.

## IV. PROCEDURAL POSTURE OF REMAINING CLAIMS

Finally, a few words bear mentioning about the procedural posture of the remaining claims in this action.  First, it appears that, because Plaintiffs' remaining breach-of-contract claim seeks damages duplicative of those already awarded by this Decision and Order, that claim is moot and should be dismissed.  Second, it appears that, because Defendant's remaining counterclaim (over which this Court possesses diversity jurisdiction) is asserted against only Plaintiff Brownson Enterprises, Inc., and Counter Defendant Peter Brownson, Plaintiff Jimico Enterprises, Inc. should be dismissed from this action.  Third, it appears that, given the nature of the counterclaim remaining in this action (and the Court's familiarity with this action), a bench trial, rather than a jury trial, might be preferred by the parties.  As a result, the parties are directed to advise the Court, in a joint letter filed on or before October 27, 2010, of their positions regarding these three issues.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs are awarded a total of $141,892.79 (one hundred forty-one thousand eight hundred ninety-two dollars and seventy-nine cents) in compensatory damages, and a total of $30,000.00 (thirty thousand dollars) in punitive damages, in the following specific sums:

(1) Plaintiff Jimico Enterprises, Inc. is awarded $120,461.38 ($41,977 in lost income at the Angola Station, plus $20,583 in lost income at the Seneca Station, plus $16,632.50 in lost

profits regarding a sale of the Angola Station, plus $21,268.88 in lost profits regarding a sale of the Seneca Station, plus $10,000 in punitive damages regarding the Angola Station, plus $10,000 in punitive damages regarding the Seneca Station); and

(2) Plaintiff Brownson Enterprises, Inc. is awarded a total of $51,431.38 ($19,123 in lost income at the New Baltimore Station, plus $22,308.38 in lost profits regarding a sale of the New Baltimore Station, plus $10,000 in punitive damages regarding the New Baltimore Station); and it is further

**ORDERED** that the parties are directed to advise the Court, in a joint status letter filed on or before October 27, 2010, of their positions regarding three issues described above in Part IV of this Decision and Order.

Dated: October 14, 2010
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge